IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEMIEL MORGAN, | ) | CASE NO.  1:22-CV-00881-BMB |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Jemiel Morgan ("Plaintiff" or "Morgan"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In November 2016 and January 2017, Morgan filed applications for POD, DIB, and SSI, alleging a disability onset date of January 1, 2016, and claiming he was disabled due to HIV, neuropathy in his legs and feet, and mental health issues.  (Transcript ("Tr.") 98, 113, 157.)  The applications were denied

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

initially and upon reconsideration, and Morgan requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 157.)

On April 2, 2019, an ALJ held a hearing, during which Morgan, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 30, 2019, the ALJ issued a written decision finding Morgan was not disabled.  (*Id.* at 157-70.)  On April 17, 2020, the Appeals Council vacated the hearing decision and remanded the case back to the ALJ for resolution of a conflict between the mental limitations in the RFC and the opinion of consultative examiner Mitchell Wax, Ph.D., which the ALJ gave great weight, as well as further evaluation of Morgan's RFC and adequate evaluation of Morgan's symptoms.  (*Id.* at 176, 178-79.)

On January 12, 2021, the ALJ held another hearing, during which Morgan, represented by counsel, and an impartial VE testified.  (*Id.* at 15.)  During this hearing, Morgan moved to amend his applications to reflect a request for a closed period of disability from January 1, 2016, to June 1, 2019.  (*Id.*)  On February 2, 2021, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-29.)  The ALJ' s decision became final on March 24, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On May 26, 2022, Morgan filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8-9.)  Morgan raises the following issue in his brief:

> (1) Whether the ALJ's decision is supported by substantial evidence when insufficient evidentiary weight was given to the opinions of the treating and examining medical sources.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Morgan was born in May 1973 and was 47 years-old at the time of his 2027 administrative hearing (Tr. 15, 27), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has a limited education.  (Tr. 27.)  He has no past relevant work.  (*Id*.)

### B.    Medical Evidence[2]

On October 16, 2015, Morgan saw Robert C. Kaylayjian, M.D., for HIV follow up.  (Tr. 538.) Morgan reported he was doing well, adhering to his medication regimen, and that his neuropathy pain was "adequately managed" on Oxycodone.  (*Id*.)

On February 12, 2016, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 534.)  Morgan again reported taking his medications as directed and that his neuropathic pain was "well controlled" on Oxycodone.  (*Id.*) Dr. Kalayjian noted that blood work in May of 2015 revealed an HIV viral load of 81, and blood work in January 2016 revealed a viral load of 155.  (*Id.* at 535.)

On July 22, 2016, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 529.)  Morgan reported increased depression and worsening neuropathy pain, as well as daily marijuana use.  (*Id.*)  Morgan told Dr. Kalayjian he had thoughts of harming himself but without a plan.  (*Id.*)  Morgan continued to take his medications as directed.  (*Id.* at 530.)  Dr. Kalayjian started Morgan on Venlafaxine for depression and directed Morgan to schedule an appointment with a mental health counselor.  (*Id.* at 532.)

On December 19, 2016, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 519.)  Morgan denied feeling depressed and reported that while he was off narcotics for his foot pain, it was tolerable with ibuprofen and relaxation therapy.  (*Id.*)  Morgan continued to take his medication as directed.  (*Id.*)  Dr. Kalayjian noted Morgan was to see podiatry regarding his foot pain.  (*Id.* at 522.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On April 17, 2017, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 502.)  Morgan reported continued foot pain that was tolerable with ibuprofen and relaxation therapy, as well as increased depression, although he denied being suicidal.  (*Id.*)  Morgan denied missing any doses of his medication.  (*Id.* at 505.)  Regarding his depression, Morgan endorsed "'overwhelming sadness,' crying, poor energy, and difficulty focusing."  (*Id.*)  Morgan reported Venlafaxine caused nausea.  (*Id.*)  Regarding his neuropathy, Morgan endorsed a burning sensation and pain in the arches of his feet and at the back of his ankles, as well as difficulty walking from time to time.  (*Id.*)  On examination, Dr. Kalayjian found good touch sensation on the big toes and palms of both feet.  (*Id.* at 506.)  Dr. Kalayjian started Morgan on Zoloft and referred him to psychiatry and podiatry.  (*Id.*)

On May 10, 2017, Morgan saw Mitchell Wax, Ph.D., for a consultative psychological evaluation.  (*Id.* at 494-99.)  Morgan reported his medical problems prevented him from working.  (*Id.* at 494.)  Morgan told Dr. Wax he had a history of special education, he left school in the 11th grade because of family problems, and that he had been suspended "over 30 times for being unruly and for fighting."  (*Id.* at 495.)  Morgan reported being diagnosed with HIV 20 years ago, and that the HIV was causing neuropathy in his feet and memory problems.  (*Id.*)  Morgan told Dr. Wax he was taking Zoloft and was in counseling for depression.  (*Id.*)  Morgan reported weekly alcohol use and bimonthly marijuana use.  (*Id.*)  Morgan told Dr. Wax he had no set bedtime or wake time, he cooked simple foods like fried bologna three times a week, he made sandwiches or microwaved his food, he bathed three times a week, he did dishes twice a week, he did laundry every two weeks, he swept his apartment every two weeks, and a friend cleaned his bathroom for him.  (*Id.* at 496.)  Morgan spent most of his day watching TV.  (*Id.*)  A friend visited Morgan four to five times a week and took him to run errands every few days.  (*Id.*)  Morgan denied any interests or hobbies, being close to anyone in his family, and belonging to any churches, clubs, groups, or organizations.  (*Id.*)  Morgan denied suicidal ideation but endorsed homicidal thoughts.  (*Id.* at 497.)

4

Morgan reported getting angry four to five times a week, telling Dr. Wax he would yell at his friend or "'have words' with strangers." (*Id.*)  Morgan also endorsed sleep difficulty and agoraphobia.  (*Id.*)

Dr. Wax noted Morgan had difficulty standing and walking to and from the examination room. (*Id.* at 495.)  Morgan thought slowly and answered questions slowly.  (*Id.* at 496.)  While Morgan at times demonstrated logical, coherent, and goal-directed speech, at other times it was vague and circumstantial. (*Id.* at 497.)  Throughout the examination, Morgan appeared sad, although no tearful effect was noted. (*Id.*)  Dr. Wax estimated Morgan's IQ to be in the low average range of intelligence.  (*Id.*)  Dr. Wax noted evidence of mental confusion and an intermittent ability to concentrate, as well as marginal flow of conversation and thought, and slow mental processing and speech.   (*Id.*)  Dr. Wax also noted memory problems.  (*Id.* at 498.)  Dr. Wax diagnosed Morgan with major depression and panic disorder with agoraphobia.  (*Id.*)

Dr. Wax opined Morgan could understand, remember, and carry out instructions on a job, but he would have difficulty maintaining attention and concentration because of his depression.  (*Id.*)  Dr. Wax further opined Morgan would not respond appropriately to supervisors and coworkers in a work setting, nor would he respond appropriately to work pressures, because of his depression and panic disorder.  (*Id.* at 499.)

On November 5, 2018, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 696.)  Morgan reported continued problems with depression and neuropathy.  (*Id.* at 696, 700.)

That same day, Morgan met with a behavioral healthcare manager to review his PHQ 9 Depression Screening score, which indicated severe depressive symptoms. (*Id.* at 707.)  Morgan reported he recently had buried his grandmother, was still struggling to cope with the loss of his mother in 2007, was frustrated with his health and pending benefits claim, and nervous about his upcoming disability hearing.  (*Id.*)  The behavioral healthcare manager noted Morgan was "very tearful" during their appointment.  (*Id.*)  Morgan

set up a time to complete a mental health assessment.  (*Id.*)

On November 13, 2018, Morgan underwent a psychiatry HIV mental health assessment.  (*Id.* at 710.)  Morgan endorsed anhedonia, feeling down, difficulty sleeping, poor energy, poor appetite, feeling worthless, poor concentration, restlessness, and suicidal ideation with no plan.  (*Id.*)  Morgan also reported feelings of anger, emotional exhaustion, significant anxiety, intense fear, feelings of abandonment, unresolved childhood trauma, and nightmares.  (*Id.*)  Morgan also endorsed anxiety symptoms such as feeling jumpy, ticks, overwhelming anxiety, being overly emotional, constant worrying, difficulty relaxing, feeling restless, and some irritability.  (*Id.* at 711.)  Morgan did not report any memory problems.  (*Id.*)  Morgan rated his physical pain as a 6/10 since he was sitting.  (*Id.* at 712.)  On examination, Mickle Chaney, LISW, found Morgan adequately groomed with full orientation, sustained concentration, cooperative behavior, an anxious, frustrated mood, congruent affect, normal speech, logical thought process, normal thought content, unimpaired cognition, good insight, and fair judgment.  (*Id.* at 713-14.)  Chaney diagnosed Morgan with major depressive D/O, recurrent, severe with anxious distress, and PTSD.  (*Id.* at 714.)

On November 28, 2018, Morgan saw Meredith Hellmer, LISW-S, for counseling.  (*Id.* at 728.)  Morgan reported chronic foot pain that caused him to lose his job as a banquet server, as he could no longer stand.  (*Id.*)  Morgan told Hellmer he had no friends and wasn't sure he wanted any.  (*Id.*)  Morgan reported enjoying solitary activities such as meditation and reading.  (*Id.*)  Morgan rated his foot pain as a 7/10.  (*Id.* at 729.)  On examination, Hellmer found adequate grooming and good hygiene, cooperative, anxious behavior, full orientation, spontaneous and normal speech, logical and organized thought process, tight association, fair judgment and insight, normal memory, sustained attention and concentration, a depressed and anxious mood, and a full range of affect.  (*Id.*)  Hellmer described Morgan's fund of knowledge as "okay."  (*Id.*)

6

On December 13, 2018, Morgan saw Hellmer for follow up.  (*Id.* at 735.)  Hellmer noted Morgan brought disability paperwork with him.  (*Id.*)  Morgan told Hellmer how much his medication helped him. (*Id.*)  Morgan reported personal relationships were a source of pain for him and a history of abuse.  (*Id.*) Morgan told Hellmer he left the house to go to the store and the library, and that he enjoyed astrology. (*Id.*)  On examination, Hellmer found Morgan well groomed with good hygiene, as well as cooperative, guarded behavior, full orientation, spontaneous and normal speech, logical and organized thought process, tight association, poor judgment and insight, normal memory, sustained attention and concentration, a depressed and anxious mood, and a constricted affect.  (*Id.* at 736.)  Hellmer again described Morgan's fund of knowledge as "okay."  (*Id.*)

On December 21, 2018, Hellmer completed a Mental Residual Functional Capacity Assessment. (*Id.* at 786-88.)  Hellmer stated that while Morgan had made progress in therapy, he "continue[d] to feel distressed by his depression and PTSD."  (*Id.* at 786.)  Hellmer noted that Morgan had difficulty with attention and concentration.  (*Id.*)  As he was distrustful of others, Morgan "would likely struggle with peer + supervisory relationships at work."  (*Id.*)  Hellmer opined Morgan had marked limitations in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others.  (*Id.* at 787-88.)  Hellmer further opined Morgan had extreme limitations in the following areas: the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an

7

unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Hellmer opined Morgan "would likely be absent" two to three days a week as a result of his depression, insomnia, and anxiety, and those absences "would likely be unpredictable." (*Id.* at 787.)

On January 9, 2019, Morgan saw Lilia Pron, APRN-CNP, for a mental health assessment update with pharmacologic management. (*Id.* at 746.) Morgan told Pron he was applying for disability and needed paperwork completed. (*Id.*) Morgan reported a history of HIV, childhood trauma, and PTSD. (*Id.*) Morgan stated he felt suicidal some days, was depressed most days, did not have a plan to hurt himself, felt overwhelmed, cried often, was emotionally drained and exhausted, had trouble sleeping, had racing thoughts, and had occasional nightmares and flashbacks. (*Id.*) Morgan also reported "severe neuropathy in [his] legs" that made it difficult for him to walk. (*Id.*) Morgan stated he had tried Zoloft and Effexor and they made him nauseous. (*Id.* at 746-47.) Morgan rated his foot pain as an 8/10. (*Id.* at 749.) On physical examination, Pron found Morgan had a steady gait. (*Id.* at 751.) On mental examination, Pron found Morgan adequately groomed with good hygiene, along with calm, cooperative, and appropriate behavior, full orientation, spontaneous and normal speech, logical and organized thought process, depressed mood, constricted affect, sustained attention and concentration, poor recent memory, fair judgment and insight, and poor sleep. (*Id.*) Pron diagnosed Morgan with major depressive disorder, moderate, with anxious distress, and started Morgan on Cymbalta and Prazosin. (*Id.* at 752-53.)

On January 11, 2019, Morgan saw Alexander Sapick, M.D., for an HIV follow up visit. (*Id.* at 759, 762.) Morgan reported doing well, although he had missed six doses of his HIV medication in the past month. (*Id.* at 759.) Morgan complained of feeling drowsy and nauseous from his medications, and of occasional loose stool. (*Id.*) On examination, Dr. Sapick found 5/5 strength in all extremities. (*Id.* at 760.)

On January 23, 2019, Morgan saw Hellmer for counseling.  (*Id.* at 768.)  Morgan reported difficulty sleeping, and Hellmer gave him a handout on sleep hygiene.  (*Id.*)  Morgan rated his foot pain as a 6/10.  (*Id.* at 769.)  On examination, Hellmer found Morgan well-groomed with good hygiene, along with cooperative behavior, full orientation, spontaneous and normal speech, logical and organized thought process, tight association, fair judgment and insight, normal memory, sustained attention and concentration, depressed mood, and full affect.  (*Id.*)  Hellmer noted Morgan was talkative that day.  (*Id.*)

On February 11, 2019, Morgan saw Hellmer for follow up.  (*Id.* at 774.)  Morgan reported increasing self-confidence and setting boundaries with people.  (*Id.*)  Morgan did not report any pain that day.  (*Id.* at 775.)  On examination, Hellmer found Morgan well-groomed with good hygiene, along with cooperative behavior, full orientation, spontaneous and normal speech, logical and organized thought process, tight association, good judgment and insight, normal memory, sustained attention and concentration, anxious mood, and a full range of affect.  (*Id.*)  Hellmer noted Morgan was coping better. (*Id.*)

On February 20, 2019, Morgan saw Hellmer for follow up.  (*Id.* at 780.)  Morgan reported having a much more positive attitude, that he had been meditating "and finding great meaning in astrology," he planned on getting his GED in the future, he had gained skills regarding conflict and boundary setting, and he had gained a lot of insight as to how his abusive childhood affected him.  (*Id.*)  Hellmer noted Morgan may return for one more session for termination of services.  (*Id.*)  Morgan rated his foot pain as a 5/10 that day.  (*Id.* at 781.)  On examination, Hellmer found Morgan well-groomed with good hygiene, along with cooperative behavior, full orientation, spontaneous and normal speech, logical and organized thought process, tight association, good judgment and insight, normal memory, sustained attention and concentration, euthymic mood, and a full range of affect.  (*Id.*)  Hellmer noted Morgan was stabilizing, coping better, and his adjustment was improving.  (*Id.*)

On March 24, 2019, Dr. Kalayjian completed a medical source statement. (*Id.* at 789-91.)  Dr. Kalayjian stated he saw Morgan every three to four months for treatment of his peripheral neuropathy, depression, and chronic HIV.  (*Id.* at 789.)  Dr. Kalayjian reported that Morgan experienced pain in his bilateral lower extremities that was consistent with neuropathic pain. (*Id.*)  Dr. Kalayjian estimated Morgan could walk less than one city block without rest.  (*Id.*)  Dr. Kalayjian opined Morgan could sit more than two hours at a time before needing to get up, and he could stand for 10 minutes at a time before needing to sit or walk around.  (*Id.* at 790.)  Dr. Kalayjian further opined Morgan could stand and/or walk for less than two hours in an eight-hour workday and sit for about two hours in an eight-hour workday. (*Id.*)  Dr. Kalayjian further opined Morgan would need to change positions at will, would need to take frequent unscheduled breaks of 10-15 minutes throughout the workday, and would be off task 25% or more of the workday.  (*Id.* at 790-91.)  Dr. Kalayjian also opined Morgan had significant limitations in reaching, handling, and fingering.  (*Id.* at 791.)  Dr. Kalayjian stated that Morgan's long-standing HIV and "debilitating" neuropathy and neuropathic pain in his lower extremities precluded Morgan's ability to work and do tasks that required standing and walking for more than ten minutes.  (*Id.*)

On April 12, 2019, Morgan saw Dr. Kalayjian for follow up.  (*Id.* at 793.)  On examination, Dr. Kalayjian found intact sensation to vibration and absent Achilles reflexes.  (*Id.* at 794.)  Dr. Kalayjian increased Morgan's dosage of Cymbalta for his depression.  (*Id.* at 797.)

## C.    State Agency Reports

### 1.    Mental Impairments

On May 17, 2017, Kristen Haskins, Psy.D., reviewed the file and opined Morgan had a mild limitation in his ability to understand, remember, or apply information, and moderate limitations in his abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 105, 120.)  Dr. Haskins further opined Morgan could perform short cycle tasks that do not have a fast-

paced demand, could interact with others on a superficial basis, and could perform tasks in "a relatively static setting." (*Id.* at 109, 124.)  Dr. Haskins explained that while Morgan's ability to handle stress and workplace pressure would be reduced, his ability would be "adequate to handle tasks without strict time limitations or production standards." (*Id.*)

On October 17, 2017, on reconsideration, Karla Delcour, Ph.D., determined there was insufficient evidence to make a determination. (*Id.* at 136-37, 147-48.)

## 2.    Physical Impairments

On May 4, 2017, Gerald Klyop, M.D., reviewed the file and opined Morgan could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 107, 122.)   Morgan's ability to push and/or pull was unlimited, other than shown for lift and/or carry. (*Id.*)

On October 18, 2017, on reconsideration, David Knierim, M.D., determined there was insufficient evidence to make a determination. (*Id.* at 136, 147.)

## D.    Hearing Testimony

During the January 12, 2021, hearing, Morgan testified to the following:

- He is 47 years old. (*Id.* at 40.)

- Back in 2016, he had HIV symptoms, along with neuropathy in his feet and severe depression, that prevented him from working. (*Id.* at 41.) He was experiencing side effects from his medications as well, including diarrhea, cramps, and occasional nausea. (*Id.* at 41, 43.) His neuropathy feels like needles. (*Id.* at 41.) Sometimes he cannot get out of bed, stand, or walk around. (*Id.*) He was very isolated at the time trying to manage his illness. (*Id.*) He could not have stood for more than two hours in an eight-hour workday without sitting and resting. (*Id.* at 42.) He could have stood for two hours if he could sit and rest in between, but he did not have a job that allowed him to sit. (*Id.*) He experienced diarrhea, cramps, and nausea about 10 days a month. (*Id.* at 43.) He spent a lot of time in the house, crying "profusely" and unable to hold it together enough to be social. (*Id.* at 44.) He got along with others, but when he was depressed, he did not want to be social at all. (*Id.* at 44-45.) He did not have a problem getting along with coworkers or supervisors on the job. (*Id.* at 45.) He would not stay around people in the general public for a long time because it was

emotionally triggering for him.  (*Id.* at 45-46.)  He could not focus because of his depression.  (*Id.* at 46.)

- In June 2019, his medication was adjusted, and he lost weight.  (*Id.*)  His feet started to not hurt as much.  (*Id.*)  He also started taking recommended herbal supplements.  (*Id.* at 47.)  He started to feel better.  (*Id.*)  He began work as a night security guard for CMHA.  (*Id.*)  He worked from 10:00 p.m. to 6:00 a.m.  (*Id.*)  He had to walk two blocks every hour.  (*Id.* at 48.)  He walked for 15-20 minutes and then sat back down until he had to make his next run.  (*Id.*)  He worked alone.  (*Id.*)

The VE testified Morgan had past work as a merchant patroller and material handler.  (*Id.* at 49.)

The ALJ then posed the following hypothetical question:

> Now, I'm going to give you the capabilities and limitations of a hypothetical person.  For this person, I would ask you to tell me if this person can do any or all of Mr. Morgan's past work.  And if not, what are other jobs in significant numbers in the national economy that they can do.  This person is male.  Same age, education, and work background as Mr. Morgan.  This person can lift/carry 20 pounds occasionally, 10 pounds frequently.  Can stand/walk four out of eight and sit six out of eight.  Push/pull would be constant bilaterally.  Foot pedal would be occasional bilaterally.  This person can occasionally use a ramp or a [sic] stairs.  Never a ladder, rope, or a scaffold.  Can frequently balance.  Occasionally stoop, kneel, crouch and crawl.  There are no manipulative, visual, or communications deficits.  This person must avoid entirely dangerous machinery and unprotected heights.  Additionally, this person can do no complex task but can do simple, routine tasks.  Which I define to mean that this person has the basic mental aptitude to meet the demands of competitive, remunerate, unskilled work, including the ability to, on a sustained basis, understand, carry out, and remember simple instructions.  This person can respond appropriately to supervisors, coworkers in usual work situations.  And can deal with changes in routine work settings.  This person can focus attention on simple or routine work activities for at least two hours at a time and stay on task at a sustained rate, such as initiating and performing a task that they understand and know how to do.  This person can work at an appropriate and consistent pace and can complete tasks in a timely manner.  This person can ignore or avoid distractions while working and can change activities or work settings without being disruptive.  This person can only do low stress work.  And I define that to mean no high production quotas or piece rate [phonetic] work.  And, finally, this person can have superficial and occasional interactions with the public and coworkers, meaning that this person is limited to speaking, signaling, taking instructions, asking questions and similar contact, but with no arbitrations, negotiation, confrontation, supervision, or commercial driving.  And that's it.

(*Id.* at 49-51.)

The VE testified the hypothetical individual would not be able to perform Morgan's past work as a merchant patroller and material handler.  (*Id.* at 51.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as document preparer, order clerk, and addresser.  (*Id.*)

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do

13

basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Morgan was insured on his alleged disability onset date, January 1, 2016, and remained insured through September 30, 2020, his date last insured ("DLI").  (Tr. 15-16.)  Therefore, in order to be entitled to POD and DIB, Morgan must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2020.

2.    The claimant did not engage in substantial gainful activity during the requested closed period (20 CFR 404.1520(b), 404.1571 *et seq.*, 416. 920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: HIV; depressive disorder; obesity; and an anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except standing/walking 4 hours of an 8-hour workday; sitting 6 hours of an 8-hour workday; can push/pull on a constant basis bilaterally; occasional bilateral operation of foot controls; can occasionally use ramps and stairs, though never ropes, ladders, or scaffolds; can frequently balance and occasionally stoop, kneel, crouch, and crawl; and must avoid all dangerous machinery and unprotected heights.  The claimant can do no complex tasks, but he can do simple, routine tasks (defined as having the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work including the ability to, on a sustained basis, understand, carry out, and remember simple instructions). The claimant can respond appropriately to supervisors, coworkers, and usual work situations and can deal with changes in routine work settings.  The claimant can focus attention on simple or routine work activities for at least 2 hours at a time and stay on task at a sustained rate such as initiating and performing a task that he understands and knows how to do.  The claimant can work at an appropriate and consistent pace and can complete tasks in a timely manner.  The claimant can avoid or ignore distractions while working and can change activities or work settings without being disruptive.  The claimant is limited to low stress work, defined as work with no high production quotas or piece-rate work.  The claimant can have superficial and occasional interactions with the public and coworkers, which means the claimant is limited to speaking, signaling, taking instructions, asking questions, and similar contact with no arbitration, negotiation, confrontation, supervision, or commercial driving.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May **, 1973 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-28.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

16

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Morgan challenges the weight assigned to the opinion of consulting examiner Dr. Wax and treating physician Dr. Kalayjian. (Doc. No. 8 at 12-16.) Regarding Dr. Wax's opinion, Morgan states that in his previous decision the ALJ found Dr. Wax's opinion to be entitled to great weight and that it was consistent with the medical evidence of record, while in the current decision the ALJ found Dr. Wax's opinion to be entitled to limited partial weight and "unreasonably" found it inconsistent with Morgan's testimony. (*Id.* at 13.) Morgan argues the ALJ mischaracterized his testimony

17

in determining he testified he had no problem getting along with others, and asserts his testimony was not inconsistent with Dr. Wax's opinion.  (*Id.* at 13-14.)   Morgan further argues one of the exhibits the ALJ cited supports, rather than detracts from, Dr. Wax's opinion.  (*Id.* at 14.)  Morgan asserts the ALJ failed to provide "sufficient, adequate reasons for discounting" Dr. Wax's opinion.  (*Id.*)   Regarding Dr. Kalayjian's opinion, Morgan argues the ALJ failed to provide "the necessary 'good reasons'" for rejecting Dr. Kalayjian's opinion.  (*Id.* at 15.)  According to Morgan, the evidence cited by the ALJ did not negate Dr. Kalayjian's opinion, nor did Morgan's testimony.  (*Id.*)

The Commissioner responds that the ALJ reasonably evaluated Dr. Wax's and Dr. Kalayjian's opinions.  (Doc. No. 9 at 6-11.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 416.927(c),[3] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id*. § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[5]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

[5] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[6] Pursuant to 20 C.F.R. § 416.927(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

### A. Dr. Wax

The ALJ weighed and analyzed the opinion of Dr. Wax as follows:

> I accord some limited partial weight to the opinion of consultative examiner Mitchell Wax, Ph.D. (B1F). Dr. Wax is a consultative examiner who saw the claimant on one occasion. Dr. Wax opined that the claimant would be able to understand, remember, and carry out instructions, live independently, but would have difficulty maintaining attention and concentration, in addition to difficulty responding to others and stress of a work environment. While I agree that the

claimant would be able to understand, remember, and carry out instructions, as the claimant has maintained personal independence regarding the mental aspects of daily living. The claimant manages his finances and medications. The claimant shops in stores, cooks simple meals, and maintains his hygiene. Curiously, Dr. Wax concludes that the claimant would not be able to respond to others or work pressures. In support of this, Dr. Wax does not cite anything other than the claimant's subjective statements: "[the claimant] stated he is anxious and depressed when around others" and the claimant stated that he "gets overwhelmed easily" when out of his house (B1F). These self-serving statements are not consistent with the claimant's own testimony, whereby the claimant testified that he has no problems getting along with others. Further, there is no indication of any marked or extreme limitations that would preclude performance of simple, routine tasks in a low stress environment that additionally limits interactions with others. What is more, B9F16 does not support Dr. Wax's ultimate conclusions about responding to others. In short, the claimant's statements seems to reflect the least that he would have been able to do rather than the most.

(Tr. 25.)

As a non-treating source, the ALJ owed no deference to the opinion of Dr. Wax. An ALJ is not required to give "good reasons" for rejecting a non-treating or non-examining opinion. *Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2018) (citation omitted). While the Court is somewhat troubled by the different interpretations of B9F between the first and second hearings (*cf.* Tr. 25, 166-67), the fact remains that Morgan's own testimony about his ability to get along with others changed from April 2019 to January 2021. In April 2019, Morgan's testimony consisted of the following:

> Q  Do you have any difficulty getting along with other people?
>
> A  I think that's like a trick question.  I don't know.  Sometimes I'm confused whether it's me or them due to my emotional state.  Sometimes I'm not sure, you know, whether it's me or them.  I spend a lot of time thinking about that too.
>
> Q  Okay.  Well, when you say not sure me or them, so there are some issues with [sic] when you're interacting with other people?
>
> A  Yeah.  Well, I'm not perfect, you know.  I'm not perfect.  I'm sure I make some mistakes.  I'm a human being.  But, you know.
>
> Q  Well, you said in the pats [sic] you've had blow ups on your job or –
>
> A  Yeah.

21

Q  -- meltdowns on your job.

A  Yeah.

Q  What – what kind of blow ups did you have on your job?

A  Just things are said to me about – basically discrimination against me.  Called fag or something like that, they'll push – you know, that will trigger me.  Or I've actually been called the "N" word sometimes, you know, in a job [INAUDIBLE].  Stuff like that.

ALJ:  But – excuse me, Counsel.  When you've had a blow up –

CLMT:  Mm-hmm.

ALJ:  -- it's because you were provoked you think?

CLMT: Yeah.  I think it was provoked.  'Cause I just don't go at somebody, you know.  It's not my style.  Yeah.

\* \* \*

BY ATTORNEY:

Q  You also said you had meltdowns on the job.  What does that mean?

A  By the time – I had been through so many things at home I just felt like my focus wasn't right.  And then I caught this disease and it just seemed like, you know, I couldn't focus, you know, on anything.  From my severe depression – I've always been depressed.

(*Id.* at 79-80.)

In January 2021, Morgan testified as follows:

Q  Okay.  Well, how are you able to get along with others?

A  How well do I get along with others? I got along with people.  I was just, you know, when you're depressed, you really don't want to be social at all.  You know, when you're on anti-depressants, you know what I mean.  If you're on anti-depressants, that's – that's depression, you know.

Q  If you were working, would you have had a problem getting along with coworkers or supervisors?

A  Oh, yeah. Oh, yeah.  I'm [a] very, very kind person, a good worker, always a team player and things of that nature.  Yeah, I didn't have an issue where, you know, I had a problem like that at work, no.

Q  I'm not talking about when you there [sic].  We've been talking about when you were not working, your depression was so severe.  Would you have had a problem if you had a job during that time frame getting along with coworkers and supervisors?

ALJ:  Counsel, I think that's too speculative.

ATTY: Okay.

BY ATTORNEY:

Q  Well, let me ask you this.  Do you have any difficulty like going to the store and being out in public?

A  Being out in public is different from actually interacting with people.  I would just stay in the house, you know.  If I had to – I just spent a lotta time in the house.  I don't know how to answer that question.  But if I interacted with people, it was hi and bye, you know, something of that nature.  I wouldn't stay around people a long time because that was to trigger emotionally and I was depressed, you know.

Q  When you say you were triggered emotionally, what do you mean?  If you were around people, what would trigger – what kind of things would be triggered?

A  Just, you know, I was depressed that I was sick, you know.  And then I had symptoms and things like that so I just really didn't want to be social, you know, during that time with the issues that I was having.  With the loose stool and, you know, things of that nature.  So, I really just basically stayed in the house a lot during that time.

(*Id.* at 44-46.)

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and he did so here.

At bottom, Morgan's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Morgan interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a

23

preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

**B.      Dr. Kalayjian**

The ALJ weighed and analyzed the opinion of Dr. Kalayjian as follows:

> I accord little weight to the opinion of Robert Kalayjian, M.D. (B11F). On March 24, 2019, Dr. Kalayjian opined that the claimant could only sit 2 hours, stand and walk for less than 2 hours, would need to shift positions at will from sitting to standing, and would need additional 10-15 minute breaks due to pain (B11F). Dr. Kalayjian also opined that the claimant could rarely lift less than 10 pounds, never perform postural activities, would be 50% limited in his ability to use his upper extremities and would be off-task 25% of any given workday (B11F). I accord little weight to his opinion, as the medical evidence does not support such extreme limitations.  Specifically, the evidence shows that the claimant had regular HIV checkups, took his medications consistently, and had a steady gait (B9F).

> Generally, more weight is afforded to the opinion of a treating source as the treating source is most often in the best position to provide a detailed, longitudinal picture of the claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or one-time examinations. (20 CFR 404.1527, 20 CFR 416.927) If a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record, it must be given controlling weight. (20 CFR 404.1527, 20 CFR 416.927, SSR 96-2p)

> Dr. Kalayjian's opinion is not even consistent with the claimant's own testimony. Dr. Kalayjian opined that the claimant would have been limited to standing/walking less than 2 hours of an 8- hour workday (B11F). However, the claimant testified that he would have been able to stand for 2 hours of an 8-hour workday.  The herein assessed residual functional capacity limits standing/ walking to no more than 4 hours, which is reasonable in assessing the most the claimant would have been able to do.  Further, the assessment indicates that the claimant would never be able to twist, stoop, crouch, or lift/carry 10 pounds or more  (B11F).  In support of such extreme limitations, the opinion cites "longstanding advanced HIV infection [and] debilitating symmetric lower extremity neuropathy . . . ." (B11F).  These statements are not supported by substantial evidence or even the source's own notes and thus they cannot be afforded controlling weight.  Notes dated from January 2019 indicate that the claimant had *full strength* in all extremities in addition to being neurologically intact (B11F:66).  The claimant presented in no distress and he actually denied

weakness, numbness, and gait abnormality (B11F:66). He denied vomiting and diarrhea (B11F:66).

When a treating source opinion is not afforded controlling weight, the following factors will be considered: the length of the treatment relationship and the frequency of treatment, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, any relevant specialty of the treating source, and other relevant factors. (20 CFR 404.1527, 20 CFR 416.927)

In affording the opinion little weight, I note that the factors of consistency and supportability are the most relevant. The opinion clearly lacks both and reads as being little more than a regurgitation of subjective complaints, which pose little in the way of persuasive value as regards the most the claimant would have been able to do. The claimant was obese during the requested closed period and he treated for HIV. He had some acute periods of side effects while medications were adjusted and he had some periods of foot neuropathy and depression/anxiety.

While the claimant may have been unable to perform work that required significant standing and walking and significant interactions with others, there is no longitudinal support for a finding that he would have been any more limited than assessed herein. I have reasonably found that his impairment-related symptoms limited him to a range of light work of a simple nature with reduced standing/walking, reduced postural activity, and reduced interactions with others in addition to avoidance of certain hazards.

(*Id.* at 26-27.)

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned. The ALJ determined that Dr. Kalayjian's opinion was inconsistent with other objective evidence in the record, citing specific examples. (*Id.*) Contrary to Morgan's assertion, notations in the medical records that he had a steady gait are relevant to his ability to stand and walk. In addition, as Morgan himself acknowledges, he testified that he could stand for two hours if he was able to sit and rest in between. (Doc. No. 8 at 15.) It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and he did so here.

Again, at bottom, Morgan's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do. While Morgan interprets the records differently, the findings of the ALJ

"are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73.  Again, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Dated: January 24, 2023                  _s/ Jonathan Greenberg_
                                                          Jonathan D. Greenberg
                                                          United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**